LAWTON v GORMAN FURNITURE CORPORATION

Docket No. 78-198. Submitted April 9, 1979, at Detroit.—Decided May 21, 1979.

Irving Lawton and his wife Kathryn Lawton and Bedland, Inc., brought an action against Gorman Furniture Corp. and Sable Office Furniture, Inc., for breach of a lease agreement. Bedland had showrooms and featured bedroom furniture. The plaintiffs desired to have a general furniture dealer in the area. Bedland's owners were agreeable to build a store and lease it to a general furniture dealer. A lease was executed with Gorman with a provision that no bedroom furniture be sold by Gorman unless Gorman referred all of its customers for bedroom furniture to Bedland. Sable was a wholly owned subsidiary of Gorman which sold office furniture. Subsequently, sales of bedroom furniture were made by both Gorman and Sable without consulting Bedland. Plaintiffs sued for damages for violation of the lease. At a bench trial the testimony of an expert accountant witness indicated that Gorman had sold bedroom furniture for a gross profit of $118,759. The expert was unable to reduce the gross profit figure because Gorman's bookkeeping system did not single out such costs as advertising, rent, heat, and employee wages. Sable made bedroom furniture sales in the gross amount of $40,353.87, but the expert was unable to determine the manufacturer's charges to Sable for the bedroom furniture or Sable's net profit from those sales. No evidence was presented showing the profit Bedland would have

REFERENCES FOR POINTS IN HEADNOTES
[1] 17 Am Jur 2d, Contracts § 441.
   22 Am Jur 2d, Damages § 304.
[2] 19 Am Jur 2d, Corporations §§ 716, 717.
[3] 18 Am Jur 2d, Corporations § 17.
   19 Am Jur 2d, Corporations § 716.
[4] 22 Am Jur 2d, Damages § 178.
[5] 22 Am Jur 2d, Damages § 46.
[6] 22 Am Jur 2d, Damages § 22.
[7] 22 Am Jur 2d, Damages § 2096.
   29 Am Jur 2d, Evidence § 131.
[8] 22 Am Jur 2d, Damages § 25.

normally realized had it made the sales. Judgment for plaintiffs, Oakland Circuit Court, William J. Beer, J., in the amounts of $118,759 against Gorman and $40,353.87 against Sable to be charged jointly and severally. The court ordered defendants to refrain from selling or attempting to sell or advertise for sale any bedroom furniture during the duration of the lease. Defendants appeal. *Held:*

1. Generally, a wholly owned subsidiary corporation is not chargeable with nor liable for the actions of its parent corporation unless the doctrine of "piercing the corporate veil" is applicable. The separate corporate entity will not be disregarded where there was no fraud, sham, or other misconduct in the creation of the subsidiary which would make the subsidiary liable for the acts of the parent. Trial proofs did not establish that corporate laws or standards were violated in the relationship between Gorman and Sable. It was not wrong for Sable to fill orders for bedroom furniture, the wrong was failure by Gorman, the parent corporation and tenant of the plaintiffs, to first notify Bedland and give plaintiffs an opportunity to fill the orders. Gorman alone is the party to be charged with the breach of contract and for any damages. The judgment and injunction issued against Sable is to be vacated.

2. Damages for lost profits are based on the loss of net rather than gross profits. In the Sable sales of $40,353.87 no deductions were made. The Gorman gross profits of $118,759 do not include the normal overhead costs which Bedland would have had to pay had it sold the furniture; therefore, if the judgments were allowed to stand, Bedland would receive more than it would have earned had the breach not occurred.

3. The judgments were based on an erroneous calculation of the damages. Generally, a plaintiff is relieved from establishing net profits where defendant's bookkeeping prevents computation of overhead costs as deductions from gross profits; however, inadequacy of proof of damages does not excuse a plaintiff from establishing net profits where the information necessary to establish these profits is in the hands of the plaintiff. Bedland's operating costs rather than Gorman's must be deducted from gross sales minus the cost of the furniture sold. All that was necessary was for Bedland to testify as to its normal operating costs and its net profit on sales. It is immaterial that Gorman's and Sable's books of account did not reflect such costs.

4. A new trial on the issue of Bedland's damages is necessary. It is clear that Gorman breached the contract and Bedland has been damaged. Proof of the amount or degree of damage is

inadequate on the record but ascertainable by the trial court on remand.

Affirmed in part, reversed in part, and remanded for a new trial on the issue of plaintiffs' damages. The order forbidding Gorman from selling any bedroom furniture is without foundation in the contract and exceeds any reasonable necessity for protecting Bedland during the period of retrial. The injunction against Sable is vacated and the injunction against Gorman should be modified to permit Gorman to make sales of bedroom furniture after fully offering the opportunity to Bedland as contemplated in the lease.

1. CONTRACTS — BREACH OF CONTRACT — DAMAGES.

The conditions of a contract must be breached to support an action for damages for breach of contract; otherwise the question of damages becomes moot.

2. CORPORATIONS — SUBSIDIARY CORPORATIONS — SUBSIDIARY LIABILITY.

Generally, a wholly owned subsidiary corporation is not chargeable with nor liable for the actions of its parent corporation.

3. CORPORATIONS — SUBSIDIARY CORPORATIONS — PIERCING THE CORPORATE VEIL — FRAUD — SHAM — CORPORATE MISCONDUCT — LIABILITY.

A wholly owned subsidiary corporation could become liable for the action of its parent corporation where the doctrine of "piercing the corporate veil" is applicable; however, the doctrine presupposes that the subsidiary was created for the purpose of perpetrating a fraud, sham, or other improper use of corporate laws or standards and where there is no proof of misconduct, the separate corporate entity will not be disregarded so as to make the subsidiary liable for the acts of the parent.

4. DAMAGES — CONTRACTS — BREACH OF CONTRACT — LOSS OF SALES — NET PROFITS — GROSS PROFITS.

Damages for lost profits in a breach of contract action, where the breach was the cause of plaintiff's loss of sales and the profits therefrom, are based on the loss of net rather than gross profits.

5. DAMAGES — CONTRACTS — BREACH OF CONTRACT — MEASURE OF DAMAGES.

The measure of damages in a breach of contract suit is to place the injured party in as good a position as he would have been in if the promised performance had been rendered.

6. DAMAGES — CONTRACTS — BREACH OF CONTRACT — MATHEMATICAL
   CERTAINTY.
   Generally, damages in an action for breach of contract need not
   be established with mathematical certainty.

7. DAMAGES — CONTRACTS — BREACH OF CONTRACT — PROOF OF
   DAMAGES.
   Inadequacy of proof of damages is not excusable on grounds that
   proof was made impossible by a defendant's own acts or omis-
   sions where the information necessary to establish the damages
   is in the hands of the plaintiff.

8. DAMAGES — CONTRACTS — BREACH OF CONTRACT — PROOF OF
   DAMAGES — REMAND.
   A remand for a new trial on the issue of damages is proper in a
   breach of contract action where it is clear that a plaintiff has
   been damaged but proof of the amount or degree of damages is
   inadequate, but ascertainable.

*Levin, Levin, Garvett & Dill* (by *David A. Gold-
man* and *Richard M. Selik),* for plaintiffs.

*Joseph S. Radom, P.C.,* for defendants.

Before: BEASLEY, P.J., and ALLEN and D. C. RI-
LEY, JJ.

ALLEN, J. This appeal involves a dispute be-
tween two furniture businesses located next to one
another in nearly identical buildings on Telegraph
Road in Southfield. One store, Bedland, Inc.,
owned by Irving and Kathryn Lawton and their
son, sells bedroom furniture and accessories dis-
played on the premises. Bedland began operating
on Telegraph Road in 1959, and according to Law-
ton maintained a large inventory from about a
dozen manufacturers so that most of his customers
were able to select a bedroom set and take deliv-
ery within a week.

Early in 1960, Lawton purchased the adjacent
property next to Bedland in contemplation of
building a structure thereon to be leased to a

general furniture store which would provide a total furniture center where customers could purchase all types of home furnishings. In 1964, Lawton commenced negotiating with Bernard D. Moray, the owner of a small furniture store on Livernois in Detroit which was destroyed the following year in the Detroit riots. In the negotiations, Lawton told Moray of his concept of a total furniture center and that if he were to build a store and lease it for such purpose such store could not conflict with the business of Bedland.

Moray was also the sole stockholder of Sable Office Furniture, Inc., (Sable), a corporation dealing in office furniture and located on Seven Mile Road in Detroit.

On March 23, 1965, a lease between the Lawtons, as lessors, and Moray, as nominee for a corporation to be formed (Gorman), as lessee, was signed; whereupon the building was built, Gorman was incorporated and was substituted for Moray as the lessee in a ten-year lease commencing July 1, 1966, with an option to Gorman to renew for a second ten-year period. Unlike Bedland, the newly formed corporation carried little inventory. Instead, it operated as a design service maintaining hundreds of catalogues. Gorman designers worked with the client who made selections from the catalogue. During its first ten years, Gorman employed 30 designers on either a commission or salary basis, and at the time of trial had 12. Orders were sent to the manufacturers from whose catalogue the furniture was selected and in turn the furniture was sent to Gorman where it was inspected and delivered to the customer.

The lease, prepared by an attorney who was Moray's brother-in-law, contained a provision that restricted Gorman's sale of bedroom furniture un-

less Gorman's decorating department, receiving orders for bedroom furniture, first referred said orders to Bedland to be filled.[1] Pursuant to this provision, Moray personally discussed with Lawton several instances where Gorman designers desired bedroom furniture. In each instance, Lawton replied that Bedland was not interested in the sale because the merchandise was not the kind carried by Bedland. In 1968-1969, Moray asked Lawton if Bedland desired to supply bedroom furniture to several condominium units at discount prices but Lawton declined on grounds that a discount was involved. Sometime following what seemed to be this lack of interest by Bedland, Gorman placed orders for bedroom furniture without consulting Bedland.

Friction between Lawton and Moray concerning the lease terms increased until February 17, 1975, when Bedland demanded that Gorman leave the leased premises, but also suggesting that the dispute could be resolved by negotiation. On June 9, 1975, Gorman exercised its option to renew the lease for a second ten-year period. On June 13, 1975, Bedland sued for damages for violation of § 51, *supra,* of the lease. At a bench trial, Bedland presented the testimony of Melwin Sewach, a cer-

---

[1] "51. Tenant agrees that it will not, in the demised premises, engage in the sale of bedroom furniture so long as Landlord, his successors or assigns, or any corporation partially or wholly owned by him, or Bedland, Inc., or its successors, operate a bedroom furniture business in the adjoining premises located at 29111 Telegraph Road; provided, however, that this shall not prevent Tenant selling accessories, chairs to be used in bedrooms, lamps or sofas which are convertible to beds. Tenant shall refer all customers requests for bedroom furniture to said adjoining business. Notwithstanding the provisions of this paragraph, in the event Tenant's decorating department receives orders for bedroom furniture, the same shall be referred to said adjoining business to be filled. If said adjoining business refuses or is unable to fill such special orders, then Tenant may have such special orders filled elsewhere. Said decorator's special order bedroom furniture shall in no event be displayed on the sales floor of Tenant."

tified public accountant, that during the six-year period preceding the suit, Gorman had sold bedroom furniture in the sum of $327,923, but after deducting Gorman's cost of said furniture the gross profit was $118,759. On cross-examination Sewach admitted that he was unable to reduce the gross profit figure of $118,759, because Gorman's bookkeeping system did not single out such costs as advertising, rent, heat, and employee wages. Sewach also testified that in 1974-1975, Sable made bedroom furniture sales in the gross amount of $40,353.87, but that he was unable to make adjustments therefrom for the manufacturers' charge or for Sable's net profits from those sales. No evidence was presented showing the profit Bedland would have normally realized had it made the sales.

Following three days of trial, the trial court rendered a verdict in favor of plaintiffs on October 4, 1977. In so doing, the court adopted carte blanche *all* the proposed findings of fact and conclusions of law submitted by plaintiffs. Specifically, the trial court awarded damages in the sum of $159,112.87, based on the following:

  a) $118,759.00—as the profit from the total sales of bedroom furniture by Gorman.
  b) $40,353.87—total sales of bedroom furniture by Gorman through Sable to avoid the restrictions of paragraph 51 of the lease.
  c) $159,112.87—Total

The award ran against both Sable and Gorman, jointly and severally. Finally, the court ordered both Sable and Gorman to refrain completely from selling or attempting to sell or advertise for sale any bedroom furniture during the duration of the lease. Defendants appeal of right.

## I

In their supplemental brief, defendants for the first time raise what we perceive to be the threshold question, *viz.*—whether the trial court erred in finding as a fact that the conditions of the lease were breached at all. If there was no breach the question of damages becomes moot. Paragraph 51 of the lease explicitly provides that orders for bedroom furniture from Gorman must be "referred to said adjoining business to be filled" but if the adjoining business (Bedland) refuses or is unable to fill them, then Gorman may fill the order. The record is clear that Gorman placed many orders for bedroom furniture without bothering to first notify Bedland. True, one cannot determine how many of such orders would have been refused by Bedland. But this defect goes to the question of damages rather than the question of breach of contract. On this threshold issue the trial court did not err. The breach is clear and the basic issues on appeal are the amount of damages, if any, and whether Gorman alone or Gorman and Sable should pay.

## II

We next turn to deciding whether the trial court erred in finding Sable liable. We first note that Sable was not a party to the contract with Bedland. Therefore, it has no liability on its own. Plaintiffs argue that Sable may be held liable under the doctrine of "piercing the corporate veil". That doctrine presupposes that the corporation was created for the purpose of perpetrating a fraud. *Gottlieb v Arrow Door Co,* 364 Mich 450, 452; 110 NW2d 767 (1961), *Elliott v Smith,* 47 Mich App 236; 209 NW2d 425 (1973). In the in-

stant case Sable was incorporated some 50 years before Gorman was incorporated. The only testimony in the record relating to the control by Gorman over Sable was that Sable was a wholly owned subsidiary of Gorman and that Moray, the sole stockholder of Gorman, was president of Sable. But such relationship is not uncommon and, by itself, is insufficient to pierce the corporate veil. *Gottlieb, supra; Elliott, supra.* It was not wrong for Sable to fill orders for bedroom furniture. The wrong was the failure by the parent corporation, Gorman, to first notify plaintiffs and give plaintiffs the opportunity to fill the order. Liability for the wrong falls on the parent rather than on the subsidiary. We agree with defendants that to support the trial court's conclusion that a dominated and wholly owned subsidiary corporation is chargeable with the actions of its parent is to stand the doctrine of piercing the corporate veil "on its head". Accordingly, the award against Sable is vacated and set aside. For like reasons, the injunction issued against Sable is vacated. The activities of Sable may be properly restrained by entry of an appropriate order against the offending parent corporation, Gorman.

### III

Having determined that defendant Gorman, and Gorman alone, is the party to be charged for the breach of contract, we must now decide whether the award of damages of $159,112.87 is sustainable. That figure was the composite of Sable's gross sales of $40,353.87, and Gorman's gross profit (gross sales minus cost of furniture sold) of $118,-759. We find the award seriously flawed in three respects. *First,* from the figure of $40,153.87, no deduction is made for the cost of the furniture

paid the manufacturer. Therefore the award gives plaintiffs a much higher sum than they are entitled to. *Second,* the figure of $118,759, although computed after deducting the cost of the furniture, does not include the normal overhead costs which Bedland would necessarily have had to pay had it sold the furniture. Damages for lost profits are based on the loss of net rather than gross profits. *Benfield v H K Porter Co, Inc,* 1 Mich App 543; 137 NW2d 273 (1965), *The Vogue v Shopping Centers, Inc,* 402 Mich 546; 266 NW2d 148 (1978). Any other rule would obviously grant the offended litigant a greater sum than he would have earned had the breach not occurred.

The *third,* and we believe the most telling, reason for our disallowance of the award is that it is based on a consideration of the profits of Gorman and Sable rather than on a consideration of the loss of profits of the plaintiffs. As was stated in *Allen v Michigan Bell Telephone Co,* 61 Mich App 62, 68; 232 NW2d 302 (1975).

"[T]he measure of damages in a breach of contract suit is to place the injured party in as good a position as he would have been in if the promised performance had been rendered."

Had Bedland been allowed to sell, it would have had to pay commissions to its designers[2] as well as costs of delivery. None of these costs were subtracted from the gross costs awarded by the trial court.

Plaintiffs argue that they are excused from failing to show loss of net profits as distinguished from loss of gross profits because Gorman's and Sable's books of account were kept in such a

---

[2] Testimony was given that the designer was normally paid 10% of the sale price.

manner that plaintiffs' accountant was unable to ascertain what costs to deduct. In support of this claim plaintiffs cite cases holding that damages need not be established with mathematical certainty[3] and decisions holding that where the aggrieved party is prevented from computing overhead costs which should be deducted from gross profits, the aggrieved party is relieved from establishing net costs.[4] We do not quarrel with the rules of law cited but disagree with their applicability to the case at hand. Since it is Bedland's operating costs rather than Gorman's which must be deducted from gross sales minus cost of furniture sold, it is immaterial that Gorman's and Sable's books of account did not reflect such costs. All that was necessary was for plaintiffs to testify as to plaintiffs' normal operating costs and its normal net profit on sales. This information was in the hands of plaintiffs. Therefore, the inadequacy of proof of damages is not excusable on grounds that proof was made impossible by defendants' own acts or omissions.[5] Clearly, plaintiffs were prevented from earning a profit on sales of bedroom furniture which might have been made had Gorman given plaintiffs notice as required in § 51 of the contract. Unfortunately, the amount of the loss of profit was improperly established and, if left un-

[3] *McCullagh v Goodyear Tire & Rubber Co,* 342 Mich 244; 69 NW2d 731 (1955), *Fera v Village Plaza, Inc,* 396 Mich 639; 242 NW2d 372 (1976).

[4] *Brady v Central Excavators, Inc,* 316 Mich 594; 25 NW2d 630 (1947), *Hendrickson v Grengs,* 237 Minn 196; 54 NW2d 105 (1952).

[5] Much of the confusion on proof of damages in this case seems to stem from plaintiffs' complaint which claimed an "accounting" of defendants' profits earned in the six years preceding suit but also asked for damages. There is a difference between a claim that profits of a defendant be turned over to the plaintiff and a claim that a breach of contract prevented plaintiff from earning profits which plaintiff would have earned had the breach not occurred. In this opinion we treat plaintiffs' action as one properly in damages.

changed on appeal, will give plaintiffs an award unconscionably greater than that to which they are entitled.

## IV

This brings us to the question of what disposition should be made on appeal where proof that plaintiffs have been damaged is clear but proof of the amount or degree of damage is inadequate. On this question our Court has taken diverse positions. In *Benfield v H K Porter, Inc,* 1 Mich App 543; 137 NW2d 273 (1965), this Court reversed a judgment in favor of plaintiff on grounds that plaintiff failed to offer any proof of expenses which should have been deducted from the commissions to which he was entitled. The case was not remanded for further proofs. However, in two subsequent cases the Court remanded for further proofs. *Thornton Construction Co, Inc v Mackinac Aggregates Corp,* 9 Mich App 467; 157 NW2d 456 (1968), *Brillhart v Danneffel,* 36 Mich App 359; 194 NW2d 63 (1971). In *Thornton* the Court found plaintiff's proof of damages "inadequate to establish any certainty upon which a judgment could be based * * * and unduly speculative" and remanded for a new trial on the issue of plaintiff's damages. Neither case mentioned *Benfield.* Given the circumstances of this case we opt to follow the procedure used in *Thornton* and *Brillhart* and remand to the trial court for a new trial on the issue of plaintiffs' damages against Gorman. Contrary to defendants' contention this is not a case where, because there is no certainty that Bedland would have made the sales that Gorman and Sable made, proof of net profits would be conjectural and speculative no

matter what proof was offered.[6] Obviously, plaintiffs cannot prove they could reasonably have filled an order placed with Gorman since plaintiffs have no knowledge of the order. Here, unlike the question of proof of net profits previously discussed, the proofs are all in the possession of the defendants. In such a situation the aggrieved party is relieved from making proofs but the offending party may mitigate damages by presenting proof that the orders were of such a type or at such low discount prices that plaintiffs would not have attempted to fill them. See *Seaboard Music Co, Inc v Germano,* 24 Cal App 3d 618; 101 Cal Rptr 255 (1972), *Hendrickson v Grengs, supra,* fn 3.

While not addressed in any Michigan case, our decision to remand on the question of damages is soundly supported by case law from Minnesota. In *Miller v Reiter,* 155 Minn 110; 192 NW 740 (1923), plaintiff sued for loss of profits when his bar was wrongfully closed down for three and one-half months. Though plaintiff introduced some evidence of what his net profits would reasonably have been during the period, the court found that "the amount of damages, reached in the manner indicated, is so unsatisfactory that a verdict of so large a sum cannot be sustained". Rather than dismissing the case the court ordered a new trial "confined to the amount of damages sustained", *Id.* at 113. In *Bryngelson v Minnesota Valley Breeders Ass'n,* 262 Minn 275; 114 NW2d 748 (1962), the court found plaintiffs' proof of profit "far too spec-

---

[6] An example of a case where proof of profits would be speculative and conjectural no matter what proof is offered is *Village of Elbow Lake v Otter Tail Power Co,* 281 Minn 43; 160 NW2d 571 (1968), and *Mississippi Power Co v Harrison,* 247 Miss 400; 152 So 2d 892, 908 (1963). The instant case is more like *The Vogue v Shopping Centers, Inc,* 402 Mich 546; 266 NW2d 148 (1978), and *Thornton, supra,* where proof of lost profit, though difficult and to some degree speculative, is still allowable.

ulative and conjectural to be sustained" but concluded that that issue and other issues "should be determined at any retrial of this litigation". *Id.* at 283.

We further observe that *Benfield* and *Thornton* may not be as contradictory as first appears. *Benfield* came to this Court on appeal from the trial court's denial of defendant's motion for a directed verdict at the close of plaintiff's proofs. In ruling in defendant's favor that the motion should have been granted, our Court never reached the issue of remanding for additional proofs of damage. In *Thornton,* and in the instant case, a motion for directed verdict was not made. Since the judgment entered by the trial court must be vacated because it is patently too high, it makes no sense to prohibit a retrial on damages and thereby force a judgment patently too low. As we stated before—plaintiffs have been wronged and obviously are entitled to damages, the extent and amount of which are within the realm of proof. Remand for that purpose is ordered.

The order forbidding Gorman from selling any bedroom furniture is without foundation in the contract and exceeds any reasonable necessity for protecting Bedland during the period of retrial. The injunction against Sable, as noted earlier, is vacated and the injunction against Gorman should be modified to permit Gorman to make sales of bedroom furniture after fully offering the opportunity of sale to Bedland as contemplated in § 51 of the lease.[7]

---

[7] The parties have not addressed the court's disposition of the lease. The court ordered that the lease continue on a day-to-day basis as long as Gorman complies with the terms of the covenant. In view of our remand for retrial on damages, we conclude that the order of the trial court as to the lease should be vacated and the lease allowed to continue for the duration of its term.

Affirmed in part, reversed in part, and remanded for a new trial on the issue of plaintiffs' damages and for modification of judgment as provided in this opinion. Costs to Sable only.